23174. Good morning. Good morning. May it please the court. Stephen Bergstein for the plaintiff appellant. We have three primary issues of substance on this appeal. We have associational discrimination under state law. We have retaliation for protected activity under state law. And we have FMLA interference. And let me start with associational discrimination. The jury can find that the plaintiff was subjected to an adverse action because of her association with her disabled daughter. This court has held such a theory of liability exists under the ADA. So it's common sense that it would also apply under the New York State human rights law. The plaintiff had taken time off. That's a big leap, right? Just because it doesn't want it. I mean, is that something we would have to hold? Is it appropriate for us to decide that? I suppose so. I can't think of a Second Circuit case that's – well, normally the human rights law follows this court's rulings on the ADA, the federal ADA. So why would this be different, right? I guess that's my argument. I'm sorry. What is the theory? Whether under the ADA or under the state law. Associational discrimination. If you discriminate against an employee because of their association with somebody who's disabled, that violates disability law. This court said so in Graziadio v. And what's the record evidence of associational discrimination? Potential associational discrimination. When plaintiff returned from leave because her daughter was in the hospital, plaintiff was able to work remotely from the hospital. So she comes back and her manager, Rivenberg, said, you know, this is going to happen again. What are we going to do if your daughter gets sick again? And basically expressing hostility toward plaintiffs having taken time off to care for her daughter. So that is certainly direct evidence. Is there an ADA case on point? Depends what you mean by on point. Is there an ADA case that recognizes associational discrimination? Recognizes associational discrimination. This is sort of a little far field where it's a statement that if you're going to have to take care of your daughter, that might be a problem. Do you have to show discriminatory animus against the purportedly disabled person that is here, let's say, the daughter? No. What is it? The parent. There are cases that say that Kelleher from a couple of years ago, this court said that Graziadio versus Culinary Institute. What about Bartman? Are you familiar with the Bartman versus Schenker case? The plain language of the New York State human rights law clearly indicates that it only prohibits discrimination against individuals who are themselves disabled. Are we supposed to interpret that as saying that there's no associational claim? Not necessarily. That may have been limited to its facts. I don't know. Bartman wasn't cited anywhere in this case, so I don't know if it's an appellate division ruling. But normally, New York State courts, when they interpret the state. Maybe I should ask a different way. Where in the statute is the best hook for the fact that there is a claim that one can bring for associational? The best answer I can give is that it's settled that under the Americans with Disabilities Act, there's such a theory of liability. And the state human rights law tracks this court's holdings. I'm sorry. I thought you said it the other way. I thought in the beginning you said that it was protected against. So just to make sure I understand, I thought you had said it was protected under state law. And therefore, it applies to the other way. No, it's settled under federal law. We know that. State law follows federal precedent. Okay. But not if we have precedent that says that they don't recognize the claim, right? Well, of course. But the evidence, just to be more clear about the discriminatory intent, quote, it's one thing after another with your daughter. What are you going to do when it happens again, Denise? Huh? And then shortly after that, there's an adverse action. They rearrange her employment relationship with the company. They remove her supervisory duties. She had a position that had numerous responsibilities. The position that I was moving into only had one. That's page 318. Fenske, with regard to that question of an adverse employment activity, a lot of the cases seem to focus on things like pay, benefits, title, all those specific types of things, which it doesn't appear like there was any diminishment of any of that. And so to me, I guess I would say the compelling claim, part of her claim, is perhaps this idea of fewer direct reports. But it does seem as if the cases say look at all of these factors, and so it's hard to envision how this is an adverse action when there's no change in pay or status or title or benefits. Well, it has to be material. And the court's totality is unique to the plaintiff's situation. Removing supervisory responsibilities is significant, right? And removing some of your responsibilities in general is significant. And isn't that really an issue for the jury? You do know that the Supreme Court is taking up this issue, and they're determining whether there's a materiality element for adverse actions. But even if the Supreme Court rules against the plaintiffs on this issue, I think a jury can find that when she came back and they changed her working relationship with the company, that that was a material change in her relationship. Did she at some point complain about unlawful discrimination? That's part of my concern about the retaliation claim. She did. She told Gillooly in July 2016 what Rivenberg had said about her impatience with plaintiffs' attention toward the daughter. Gillooly was not sympathetic, according to the plaintiff. Gillooly agreed with Rivenberg. Right, but where is the – so you're saying that is the sole basis for inferring that it was a claim of discrimination as opposed to some other explanation? Well, that's the basis for the retaliation claim.  Telling Gillooly, this is what Rivenberg said to me, and Gillooly agreed with Rivenberg, unfortunately, but it's still protected activity. Shortly afterward, you have what we describe as a demotion, a change in job responsibilities. In addition to removing her subordinates and changing her actual responsibilities, they rearranged the conditions in which she could take time off. When was she put on notice of that? Put on notice of the adverse action. That she would be required to accept this new position. Well, that's another ambiguity in the record, I think. They hinted at it over the summer, July 2016. They said, well, you should consider a different position. This potential of taking on a new position, that's not a concrete representation that you're about to be – you're going to be demoted, so if you are – And I'm sorry, this is somewhat related to that, but so in terms of when there was notice of the new position, you seem to be arguing that it's unclear, but as far as the work from home policy, wasn't that clearly conveyed to her in July 2016? And if so, isn't that part of the claim? Is there a time bar problem there? I don't know that it was conveyed to her, that concrete change in remote working was conveyed to her in July. It was prior to November, definitely, wasn't it? She accepted, quote, unquote, accepted the new arrangement in mid-November 2016. That's with the motion, but when they first told her, look, if you want the time off from now on, you can have one remote day a week, and if you need more than that, then you do pay time off or FMLA. That was conveyed to her in the summer. I don't think that it was conveyed to her in the summer. I think in the summer they told her, consider another position. There's a potential – let's talk about the potential of taking on a new position. Then there was some working on the job description going on into the fall, and then it became concrete in mid-November 2016 when she – But the work from home change was not – at least I didn't read it as being tied specifically to the change in position. My understanding was when she came back from the leave in March, at the time when they're first telling her, hey, maybe we need to do something else, you can't work from home permanently, that was – maybe that discussion started at the same time that the change in position happened, and I understand your view that the change in position perhaps was not finalized until November under your view, but in terms of the idea that she would not be able to just work from home regularly, that was conveyed, I thought, sometime during the summer. Perhaps not, but that's – I don't think it was conveyed in a concrete way over the summer. I think it became clear in November. When the district court took up the FMLA interference claim, which is related to this, the district court assumed that the operative date was December 2016, and the district court characterized it as a continuing violation, so it's within the three years. The employer doesn't really challenge that ruling on appeal. So, you know, whenever the decision was made to change her remote working relationship with the company, as the district court saw it, that was, for purposes of timeliness, a December 2016 event, because it was still in place in December 2016. She did resign the following month because she recognized she couldn't work under these circumstances. But, you know, ambiguities like this are the reason why we can't grant. Yeah, so I think that in the 56.1 statement, the ambiguity about – well, whatever ambiguity might exist about when she received notice that she would lack control over this reassignment was admitted or conceded. In other words, there's a statement by the defendant and no rebuttal – no denial, rather, of that statement about timing and what she understood about the new position. This is 47.1 and 451. 47.1? Yeah. But I don't see a date attached to this. Although it refers back to deposition transcripts that have dates before November 7. Well, the 56 paragraph 47 says, Kemp worked with Hutchinson to create a new position. Plaintiff disputes that. That's 47.1. She had some control over the new position, but an employee never has complete control over a new position. Plaintiff disputes the facts in paragraph 48. Oh, we're talking 48? No, I'm talking about plaintiff disputes the facts in paragraph 47, right? And then 47.1, for whatever reason, is not disputed. No, that's the plaintiff's explanation for disputing paragraph 47. 47.1 is the plaintiff's language, not defendant's. Oh, okay. Right. Well, even better. It seems to me that she concedes there that she was on notice that she was going to lose some control over the reassignment. But that doesn't give us a concrete date. I think they were working on it, and management was working on it into the fall, but it wasn't clear until mid-November this is going to be the new arrangement. But even if Your Honor is correct, the district court said it's a continuing violation into December, because that was going to be the new working relationship. I don't see defendant disputing that on appeal. So if that's true, December 2016 is the operative date, then we're within the three-year statute of limitations. Did the district court talk about the continuing wrong or violation doctrine in the context of this particular issue? Yes. It's toward the end of the opinion. I can find it. If you give me a minute, I can maybe bring it up on rebuttal. Special Appendix 14. Fourteen. Fourteen. Right. First full paragraph. Since it is undisputed the date of the last event, continuing the alleged violation occurred at the very latest, December 2016. Right. Plaintiff has not shown the defendant's conduct represented a willful violation. Well, that's a different whole thing. And that's the FMLA. And then where does it talk about? First full paragraph on Special Appendix 14. Since it is undisputed the date of the last event, continuing the alleged violation occurred at the very latest in December 2016, and this actually was brought on November 7, 2019, the court would have to find willfulness for there to be a three-year statute of limitations. The point was, of course, we argue it's willful, but the court said for purposes of this discussion, it's a December 2016 episode. That doesn't fall outside the three years. So if we find it's willful, then there's a FMLA interference discouragement claim. Okay. Can I just make sure that I'm sorry for the presider's indulgence? I just want to make sure that I am understanding the matter related to the constructive discharge. That is December 2016. Is that correct? I mean, that's when you argue that she provided her resignation. That's when the claims associated with constructive discharge happened. How does the constructive discharge claim intersect with the protective association and the discrimination claim? It's really she resigned because the new arrangement was not workable for her, and she knew she was going to be using up FMLA to take care of her daughter. And so the constructive discharge is indisputably timely if this court finds constructive discharge. I would remind the court that we cite a series of – I'm sorry. The question I asked is how does the constructive discharge claim intersect or does it with the other two claims that you made, that when she conceded in 2016 that that's when they told her she'd only be allowed to work one day, when she spoke in July of 2016 about the potential new role, how does the constructive discharge save or not save those other two allegations? It's really separate from those claims because it's – Okay, so that's what you're saying. They're separate claims. Right. So there's the constructive discharge claim, and then there's these other two things. Right. Okay. The constructive discharge claim is a back pay claim. The other two are just disparate treatment discrimination claims. Okay, that's fair. Okay. May I just ask you one more, just almost a housekeeping matter. Do you acknowledge that the FMLA claim is viable only if there's a willful FMLA violation? Yes. Okay, so I think that that's what you said earlier. Right. Can you, and maybe you'll be able to do this on rebuttal, point me to evidence in the record that the company acted willfully? Sure. In other words, with reckless disregard. Sure. The willfulness is similar to the evidence that we're relying on for the associational discrimination and the retaliation. There was genuine hostility to the fact that she had taken off to care for her daughter in June of that year, so they take action that essentially limits her FMLA opportunities going forward, that she's going to have to start rationing her FMLA because she can't take it as freely as she did in the past. Where is the evidence that they knew that they were violating the FMLA, which is what I knew or acted with reckless disregard as to whether their conduct violated it. Because previously you could work remotely without taking FMLA, and she needs to save up that FMLA for the serious moments when her daughter's back in the hospital. That's what you're relying on. But then they- We'll hear from you on rebuttal. Okay. We'll hear from your friend on the other side, Mr. Clark. Good morning. Good morning, Your Honor. Your Honors, may it please the Court, Sean Clark on behalf of the Appellee Regeneron Pharmaceuticals. Regeneron treated Ms. Kemp well during her eight-year career at Regeneron. It promoted her three times. It awarded her raises and bonuses. It granted her stock that was valued at $2 million by the time she retired. It permitted her to work from home 15 of 20 work days in June 2016, granted her a one-day-per-week work-from-home accommodation that no other manager at the company had. It allowed her to participate in creating an entirely new position when she decided, not demoted, when she decided to move to a new position, and it actively tried to retain her after she announced her retirement. Do you agree, obviously the government has weighed in, in this case, right? They have as an amicus on one point. Well, on that point, with respect to interference with the benefits available to an employee under the FMLA, do you agree that there was error? No. Why don't you address that? Yeah, let me explain. The Department of Labor and plaintiff take the position, and they're right here, that the FMLA does not require on an interference claim the plaintiff to show that she was denied the leave. That's right. That's the correct standard all the parties agree. That's not what the court did here. What the court did here was first analyze the willfulness of the claim, because if there was no willfulness, it was time barred. So the court said the company had twice granted FMLA leave, therefore no willful violation, and then it went back to the claim and said, well, if no willful violation, a two-year statute of limitations applies, and plaintiff's claim is barred by over a year. So I think the Department of Labor and plaintiff misread the court's opinion in that regard. It's really a statute of limitations argument that the court makes, and then says that there is no willful violation here. But as I understand what you're saying, if we disagreed with your interpretation of district court's opinion, you would agree that that was error. In other words, if the district court seems to have required a showing of a denial of benefits as opposed to mere interference of benefits under the FMLA, that would be error. If that's what the district court said, it would be harmless error, because the district court was still right in finding no willful violation. I appreciate that, but you would agree that that would be error? Yes. Okay. So the district court did properly find that plaintiff was not constructively discharged. She did not suffer an adverse employment action, and as we talked about, yes. Can I just on the adverse employment action? So losing supervisory responsibilities, that does strike me as a diminished position. I mean, it's the type of thing that I would think if you're going to a new position, and they're asking you what were your duties at the old ones, the fact that, well, I didn't manage people. I mean, I guess, can you speak to that? Because I know I previously asked the fact that her position in terms of the salary and benefits and those things stayed the same, but this loss in direct reports, why isn't that sufficient to constitute an adverse action? Well, to start, it never happened. From the time she's promoted to senior manager until her very last day of employment, Ms. Kemp has direct reports. Basically you're saying we do not have to decide as a matter of law that reducing the number of reports is not an adverse action. You're actually saying there was no evidence that that occurred. Exactly. You need not reach the point of saying whether it was an adverse action, but to Your Honor's point, even if it did happen, it was not an adverse action because it didn't correspond with a material diminution in salary and benefits and title, and there's record evidence to suggest that other employees at Regeneron are very high-level employees who don't have direct reports. You can be a high-level sole contributor or individual contributor, which she would have been had she transferred into the role, but again, we never get there. That is theoretical on these facts. On the adverse employment action, let me address the work from home issue. Plaintiff's contention is that allowing Ms. Kemp to work from home one day a week is an adverse employment action. It's not. It's a benefit. No other manager at Regeneron was permitted to work from home. The idea was they'd be in the office, be ready to answer questions and address issues from supervisees. Ms. Kemp was allowed to work from home one day a week without asking prior approval, without giving an excuse for working one day a week, and that did not prevent her from taking leave or working from home on other days. It just meant that for the other days she had to do what every other person did, which is seek the leave, ask for the approval, talk to her manager. Ms. Kemp actually admits in her deposition that she was never denied time away from the office, that she needed to care for herself or her daughter. Let me address a point that appellant made about the court's finding, which the court didn't find. So the court did find that the FMLA claim was time barred. It did not find, as to any claim, that there was a continuing violation. That portion is in the district court's discussion of FMLA. It does not apply to the discrimination retaliation claims here. Those claims are time barred. We addressed it in our brief. The district court below actually never reached that, so this court did not reach that either. On the constructive discharge claim, Your Honor asked how that fits in here. It is the adverse employment action that the plaintiff is alleging is the reason for her discrimination. And let me address that constructive discharge claim, because the facts suggest there is no constructive discharge. Ms. Kemp, Ms. Kemp gave 18 days notice of her resignation. She remained employed at the company for six months after learning that she'd have to work from home for one day per week. She told employees at the company that she had spoken with a financial advisor, and she was financially ready to resign or retire. She had $2 million worth of stock. Of course she was. That undermines any potential claim of constructive discharge. But they also asked her to come back, right, and she tried to consult. Exactly right. And in two scenarios. One, when she gave her notice of retirement, the executive vice president at Regeneron said, what can we do to keep you to stay? Obviously not evidencing an intent to get rid of her. She then, four months later, asks, well, maybe I want to come back. Can I come back as a consultant? And the company engaged with her. Yeah, sure, let's talk about it. Ultimately Ms. Kemp herself decided not to take the engagement, but the company was willing to have her back, and Ms. Kemp was willing to come back. So someone can't be constructively discharged from a job that they're willing to return to. Let me address the demotion claim that Appellant focused on. This was not a demotion. It was at best a transfer that never happened. Ms. Kemp testified at her deposition, it's the record at 121 and 122, that she had the option to either stay in her current position or to move into this new position that she herself participated in creating. So it wasn't a demotion. Employees don't get to weigh in on demotions. This was a transfer of her own decision. She weighed in on that transfer, ultimately never took it. Her salary would have remained the same. Her title would have remained the same. Her benefits would have remained the same. Her status in the hierarchical organization of the department would have remained the same. Can I just ask you, you mentioned a couple of times the idea of she never went to the position, so therefore that sort of answers the question. So is your view if someone is told, you know, starting in January, you're going to have this new position, it's going to be less pay, and you're going to have a different title, and you're going to be in the bad part of the office, and the person leaves before then, then that's, well, that wasn't an adverse position because they ultimately didn't move into that? There's a distinction in there. So some of the courts, some of the cases this court has decided has said, if there's a threat of we're going to decrease your salary by $20,000, the employee need not stick around for the reduction. But there needs to be that level of impending threat, an actual demotion, not a suggestion of a transfer. And the testimony here for Ms. Kemp herself is that this was a, quote, suggestion by her manager, not a requirement. So, yes, she did need to move into the other position in order to have a claim of adverse employment action. But, again, even if she did, it was not adverse. She chose it. She formed it. She ultimately decided she didn't want to have it, but she could have. This was not adverse in any respect. Can I ask what is your position on whether or not the New York human rights law recognizes an associational claim? I think we assumed in our papers without stating that it does. The state law typically follows, is coextensive with federal law. So we assumed it does. I don't have a position. I'm not familiar with the Berkman case Your Honor mentioned this morning. But we assumed for purposes of this case that it does. And even if it does, summary judgment is still appropriate. Because? Because it's appropriate because what? Because even assuming an associational disability claim were cognizable under state law, there's still not an adverse employment action here. There still isn't an inference of discriminatory or retaliatory intent. Well, he points to statements, Mr. Brooks, he points to statements that refer to the daughter's disability as a reason for treating Ms. Kemp in a particular way. And he says that that is at least some factual support for this claim of discrimination under state law. I see my time is up. Can I answer? Of course. The statement we're talking about, to be clear, Ms. Kemp says that she disclosed her daughter's disability on her very first day. The company knew for eight years her daughter had a disability. She had taken leave before. The statement was, what are you going to do in the future if you have to be absent again? At worst, it's a statement of concern. It is certainly not a discriminatory statement of you did this, so therefore we are going to take adverse employment action against you. It's worth noting here that the 15 days she took off in June of 2016 were not protected leave days. They weren't sick days. They weren't vacation days. She just didn't report to work. She worked from home. And the company allowed her to do it, but at a point it got excessive. Ms. Kemp herself admits it was the most she had ever worked from home in her entire eight-year career. Thank you very much. Thank you. Rivenberg's response after Plaintiff came back from the remote working assignment doesn't sound like a statement of concern. She said, it's one thing after another with your daughter. What are you going to do when it happens again, Denise? Huh? That sounds impatient, not concerned. The one-day-off-a-week work-from-home arrangement might work for some people who don't want to be in the office anyway, but it doesn't work for the plaintiff because it's going to require her for the first time to start counting her FMLA days because she might use them up a lot more quickly than she did in the past. The record shows. But my question, though, is at some point, I mean, the interference would be her not allowing to be used the FMLA days, right? That would be the interference, saying you are welcome to use them. How is that interference? It's discouragement, which is closely related to interference. You're going to not take FMLA days because you're afraid you're going to use them up because you only get 12 weeks a year. So if others in the workplace are still working remotely who had the same title she did and she was able to work remotely without having to use FMLA days, and now they say you're going to be on the FMLA clock, that's an adverse action. No, certainly telling one person who's behaving the same way that you have to use FMLA days and another person you don't, but where's the evidence that somebody else who needed to take care of somebody or somebody else was not having to take FMLA days? I mean, what we're hearing is that everybody had to come back, and she was the only one allowed to work remotely, so she had extra days that she didn't have to reuse for FMLA days. No, it's the opposite. Remote working was the norm in the workplace. It was a routine, acceptable thing for the auditing department. That's 267. Some employees work from home all the time. The department worked as a team. If you don't come in, somebody covers for you in the office, but it was very regularly. My sense of this record is that she was treated as well, if not better, with respect to remote work than everybody else. Until she came back from the hospital stay from her daughter, and they said that was a long time, and it's going to happen again. What are we going to do? This is a problem. Guess what? We're changing the relationship now. You have to be in the office four days a week, unlike in the past, and if you need more than that, now you're going to start using FMLA, but that's not how it was in the past. In the past, people worked from home. It was pretty routine. The record, at least if the jury believes the plaintiff's testimony in the 246, 247, thereabouts, and the record 243, 267, it was common to work from home. Suddenly that changes for the plaintiff after she comes back from caring for her daughter. That's the fact issue here about whether it was routine, whether it was really beneficial to her. It wasn't beneficial to her because she- But you've got to put all this in the framework of discouragement and interference, and it's got to be a willful violation of the FMLA. Do you agree with that? Yes. They're interfering by limiting how frequently she's going to take it in the future, which is really discouragement. You're discouraged from using up your FMLA because you're now on the clock, and that was not an issue in the past. The rule would be that if we only allow you, employee, to work remotely one day a week, that that constitutes or qualifies as interference with your FMLA rights. Or discouragement because you're going to start rationing. You just told us that discouragement is- They're closely related apparently under the cases, but you're going to think twice about working from home. But that's the rule. Yes. You're going to think twice about using up your FMLA, which you didn't have to worry about in the past. That's discouragement. You don't want to run out of FMLA when you have a sick daughter who might end up in the hospital again. That just wasn't her concern prior to this new arrangement. Don't get me wrong. I'm sympathetic, but that's a big rule. But this court doesn't have cases on discouragement, I don't think. So here we are. But there's cases around the country. Department of Labor has weighed in on this. But it makes sense. If you're setting up an arrangement where somebody is now going to be rationing their FMLA, which it hadn't done in the past- It almost sounds like they're discouraging her from working from home, not from using the FMLA. And there's no entitlement or no cases that you, I think, decided to show that that sort of working from home, the removal of that or the lessening of that is an adverse reaction. So what they're doing is, I think a better argument is they're discouraging her from working from home, but that's not the same as discouraging her from using her FMLA. Well, two part answer. You would discourage you because you're now worried you're going to use up your FMLA a lot faster, so you're going to work in the office more often because you have to save your FMLA. Right, that discourages you from working from- What they're doing is discouraging her from working from home. Right. But how is that discouraging her? You're sort of presenting it as if these are equal things. And they're discouraging her from working from home, and she's got to balance that with the FMLA, so ergo they're discouraging her from using the FMLA, but they're not, it's not the same. She's working from home. But you're less likely to invoke your FMLA because, but it's also- No, no, no, no, she's, I mean, I mean, Trish Lee has picked up on my problem with all of this is that it's working from home. So that is not an FMLA leave. FMLA leave means you're not working, you're taking care of your family member. You're saying she should have been allowed to work from home, which means eight hours working from home. Well, that's what she had been doing. That's what people do in the workplace. They don't worry about FMLA unless they really need it, but they work from home and they have to work from home, and no one really second-guessed it until she did it in June, and she was out for a couple of weeks, and they said that's too long, so you're going to think twice under this new arrangement. I can't start using up my FMLA. I'm going to run out. We have your argument, I think, well in mind, and we appreciate it. Thank you very much. Thank you. We'll reserve the decision.